COURT OF APPEALS OF WEST VIRGINIA. 219

Jan'y Term,      Hood, et. al. vs. Maxwell.      1866.

# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## HOOD, *et al, vs.* MAXWELL.

### January Term, 1866.

1. A judgment on a verdict for the plaintiff, virtually overrules all demurrers to the declaration and each count thereof.

2. A count in trover and conversion may be joined with a count in trespass on the case.

3. It is not error to try a cause against a part of the defendants who have appeared and pleaded, and when there is an office judgment not set aside, as to the other defendants.

4. It is not error in the court below to permit a witness, not proven to be an *expert*, to testify to the value of wheat per bushel, when the price of flour per barrel is given him as a basis from which to estimate that value.

5. Where a number of instructions to the jury are asked for and the record states an exception to the refusal to give a part of them only, the inference is that the court gave those to which no exception was taken.

> QUÆRE? How far an appellate court is bound to revise the rulings of the court below, when the record shows a number of instructions asked for and refused, and a general exception taken to the refusal of each; even though it appear some of the instructions were good and some bad?

6. No State of the Federal Union has a constitutional right to secede from it.

*John Maxwell* sued out of the clerk's office of *Marion* county, a writ of trespass on the case in trover and conversion, on the 19th day of November, 1861, against *Mortimer H. Johnson, William Hood, John N. Burns* and *Henry Mahoney.* The plaintiff filed his declaration at the December rules following. It contained three counts; the first of which was a count in trover specifically mentioning the articles taken and converted to the use of the defendants, as follows: 1041½ bushels of wheat, 30 bushels of corn, 15 barrels of flour, 75 empty flour barrels, 1 brown horse, 1 wagon, harness, bridles, &c., and provisions sufficient for meals for thirty persons, of the value of 1980 dollars and 75 cents.

The second count was similar to the first, without specifying the articles or alleging any value. The third count

was in the following words: "And also for that, heretofore, to-wit, on the     day of     1861, at the said county, the said defendants by themselves and by divers other persons acting under and by their order, direction and incitement, wrongfully, unlawfully and injuriously, did take and carry away divers goods and chattels of the like number, quantity, quality, description and value, as the said goods and chattels in the said first and second counts mentioned, whereof the said plaintiff was possessed then and there as of his own property; and the said defendants the same have henceforward hitherto kept, and continued and caused to be kept and continued so taken and carried away from and beyond the knowledge and possession and reach of said plaintiff: by means and reason whereof, the said plaintiff has been, and yet is injured and damaged greatly and to the value of the said goods and chattels, by means of all which grievances by the said defendants, the said plaintiff has sustained damage to the sum and amount of 3000 dollars, and therefore, &c."

At the February term, 1862, of the county court, the defendants, *Johnson, Hood* and *Burns*, appeared and demurred to the declaration and each count of the same, "and the court having heard the argument of counsel on said demurrer, was of opinion that the plaintiff's declaration *was* sufficient in law." The demurrer was overruled and the defendants named, pleaded not guilty. A trial was had at the April term following, but the jury being unable to agree was discharged and the cause continued.

At the July rules a writ was directed to the sheriff of *Taylor* county, requiring him to summon *Mahoney*; which was returned executed on the 27th day of the same month. A conditional judgment was had against him at August rules, which was made final at September rules. The cause was docketed in the circuit court of *Marion*, in October, 1863, by reason of the provision in the constitution of the State of *West Virginia*. The case was again tried at the April term, 1864, when the jury rendered a verdict for 1516 dollars and 25 cents, with interest from the 1st day of June, 1861. The defendant *Hood*, moved the court to set aside

the verdict, and grant him a new trial; but the court over-ruled the motion and gave, judgment upon the verdict.

During the trial the defendant *Hood*, (who alone appeared by attorney thereat) tendered two bills of exceptions to the rulings of the court. The first bill was to the permission of a question propounded by the plaintiff's attorney as follows: "State if flour is worth eight dollars a barrel, what is good wheat worth a bushel?" To which the witness replied "from one dollar and forty to one dollar and fifty cents per bushel:" which answer was permitted to go to the jury, and to which the defendant excepted.

The second bill of exceptions embraced the evidence in the cause, which was substantially, that in May, 1861, the plaintiff owned and occupied a merchant mill in *Barbour* county, and was possessed of the property specified in the declaration. That about the 28th day of that month, the defendants, *Johnson*, *Burns* and *Mahoney*, together with thirty or fifty cavalrymen under their control, took from the plaintiff's premises and possession the property mentioned in the declaration, and conveyed it to *Phillippi* in the same county. That of the flour so taken, sixteen barrels were deposited in the commissary office of defendant *Hood*, in *Phillippi*, and by him disbursed to the troops stationed at that point; *Hood* as commissary, and the troops as such, claiming to act under and by virtue of the authority of *John Letcher*, Governor of *Virginia*. That four hundred bushels of the wheat was reported to the commissary's office as having been deposited in a mill at *Phillippi*. That one *B. F. Martin* at the office of the commissary, and by direction of the defendant *Wood*, wrote to the plaintiff a letter in the following words: "PHILLIPPI, VA., June 1st., 1861.

Mr. *John Maxwell*, Dear Sir:—Mr. *Arnold* has presented your claim for wheat and flour. It is not in proper form. You will have to come and see me and we can arrange it satisfactorily. I'll guarantee you perfect safety in coming and returning. We must have receipts in due form. Besides we desire to arrange the price with you in a satisfactory manner. Yours, &c. *William Hood*, commissary."

222 COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,       Hood, et. al. vs. Maxwell.       1866.

That one *Charles W. Phillips*, at the instance of the plaintiff, went with an account made out by the plaintiff to *Huttonsville*, in *Virginia*, to collect from the military authorities (they having gone to that place from *Phillippi*,) the money for the wheat, &c., taken as before mentioned; and that *Phillips* went to one Colonel *Porterfield*, at headquarters, and communicated his business, that *Porterfield* referred him to the commissary's office, and when there he was introduced to defendant *Hood* who said that the account was a trumped up affair, and that he could not pay it, and that the books and papers containing the amount of the wheat and flour, and his clerk, had been captured at *Phillippi*. That the plaintiff during the time of the taking of the property was under arrest, and that the defendants with a number of troops and others claiming to be the troops of the State of *Virginia*, and defendant *Hood* claiming to act as commissary therefor, were stationed at *Grafton*, *Virginia*, on the 23rd of May, 1861, and from thence went to *Phillippi*. The defendant offered evidence to prove that, within a day or two from the time of the taking of the property, one *M. Arnold* went to *Phillippi* at the instance of the plaintiff, with an order from the plaintiff to the defendant in the following words:

" *William Hood*: Please pay *M. Arnold* for the flour and wheat sold to Colonel *Johnson*, to-day.   *John Maxwell.*"

May 29th, 1861.

That the letter from *Hood* to the plaintiff was written upon the presentation to him of this order by *Arnold*. The plaintiff to rebut this proved, that the body of the order was in the handwriting of the defendant *Burns*, and he did not deny that his signature was to it, but offered evidence to prove that it was so written whilst he was under guard and confined to his premises.

The defendant moved the court to give the jury fourteen several instructions; but the court refused to give the first eight, and to this refusal the defendant excepted. Those refused, and which are only necessary to be given here are as follows:

"1. If the jury believe from the evidence that the plain-

tiff drew his order on defendant *Hood* for the payment of the wheat and flour specified in his declaration, which he had sold to the defendant *Johnson*, that this action cannot be sustained.

2. That if the jury believe from the evidence that after the said property had been taken from the plaintiff's possession, that he treated the same as a sale to defendant *Johnson*, by giving an order on defendant to pay for the same, that they must find a verdict for the defendant *Hood*.

3. If the jury are satisfied from the evidence that the defendant *Hood*, *did* convert to his own use a portion of the property specified in the plaintiff's declaration, they can only find a verdict against him for the value of the property so converted.

4. If the jury believe from the evidence that the said property was obtained from the plaintiff by the defendants, or any of them, under the color of a contract from the plaintiff, they must find a verdict for the defendant.

5. If the jury believe from the evidence that the defendant *Hood* did not take from or receive of the plaintiff any of the property specified in the declaration, they must find a verdict for defendant *Hood*.

6. If the jury believe from the evidence that the defendant *Hood*, acting in the capacity of commissary for troops of the State of *Virginia*, by authority of the Governor thereof, in May, 1861, received into his possession either in whole or in part the property specified in the plaintiff's declaration, as such commissary, for the use of said troops, that such possession of and connection with the said property is not such conversion thereof as to justify them in rendering a verdict against him the said *Hood*, in this cause.

7. If the jury are not satisfied from the evidence that there was a joint conversion to their own use, by all the defendants, of said property either in whole or in part, they must find a verdict for the defendants, or such of them as did not convert such property.

8. If the jury are not satisfied from the evidence that the defendant *Hood* converted to his own use the property in

plaintiff's declaration —, or some part thereof, they must find a verdict for him the said *Hood*."

The court, on motion of the plaintiff, instructed:

"1. If the jury believe from the evidence in this cause, that the defendants appropriated the property mentioned in the declaration, or any part thereof, to their own use, or that they destroyed the same, or exercised dominion over it in exclusion or defiance of the plaintiff's right; or withheld the possession from the plaintiff, under a claim of title inconsistent with the title of the plaintiff; or that they unlawfully took the said property, with intent to apply the same to the use of the takers, or of some other person or persons other than the owner, or having the effect of destroying or altering the nature of the same, then they must find for the plaintiff against all of the defendants so believed to be guilty, and for such damages as the property so converted by them was worth at the time of the conversion.

2. If the jury believe from the evidence in this cause, that the defendants jointly, or acting in concert, unlawfully carried away the property of the plaintiff mentioned in the declaration, and converted it to their own use, or to the use of persons other than the owner, they are liable."

All of the defendants petitioned this court for a supersedeas, alleging for error:

*First*, That the court erred in not disposing of the separate demurrers to the several counts in the declaration.

*Second*, That the third count in the declaration was bad as a count in trover; and that on a demurrer it was not good as a count in trespass: but if good as to the latter, it was a misjoinder with the other counts, and the demurrer to the whole declaration should have been sustained.

*Third*, That no plea having been filed nor issue joined as to *Mahoney*, nor the office judgment against him set aside, it was error for the court to try the cause as to him jointly with the other three defendants, as to whom an issue had been made up; and to receive a verdict and render judgment thereon jointly against all the defendants.

*Fourth,* That the proving of the value of the wheat in the manner permitted by the court was improper.

*Fifth,* That the court erred in refusing to give the instructions asked for on behalf of the defendants and each of them.

The cause was argued here for the plaintiffs in error, by *G. H. Lee,* who in connection with *B. Wilson,* also submitted some printed notes which embody the substance of the oral argument, and are here appended.

Upon the first and second points, assigned as error in the petition, which we will consider together, we insist that upon no fair construction of the order of the 7th of February, 1862, can it be held to indicate any action on the part of the court upon the separate demurrers to the several counts of the declaration? After noticing the filing of the demurrers to the whole declaration and to each count, and the joinders therein, it proceeds to declare the opinion of the court to be that *the declaration* was sufficient in law, "and therefore said *demurrer* is overruled." This is precisely the order that the court should have made if every count had been bad excepting one; for if a declaration contain several counts and the demurrer be to the whole declaration, the demurrer must be overruled if it contain any count good in itself; provided, there be no misjoinder of counts which cannot be united in the same declaration. Com. Dig. Pleader, Q. 3, 5; 1 Saund., 286, n. 9; 2 Saund., 379, 380, n. 14; *Powdick* v. *Lyon, &c.,* 11 East., 565; *Roe* v. *Crutchfield,* 1 Hen. & Mun., 361; 1 Chit. Pl. ch. 9, title "Demurrers," p. 576, (Phil. Ed., 1828;) *Duke of Bedford* v. *Allcocke,* 1 Wils. R., 252.

The writ was in trover, and the two first counts in the declaration were appropriate to that action. The third count omitting the *quod cum* found in the two first counts, alleges wrongful, unlawful and injurious taking and carrying away of the plaintiff's goods from the possession of the plaintiff, and the keeping and continuing "so taken and carried away" of the same from the knowledge, possession and reach of the plaintiff to the injury of the plaintiff to the

value of the goods. It was probably intended to be a count in trespass *de bonis asportatis*. It is clearly not good as a count in trover, because no conversion of the property is alleged, and the conversion is the *gist* of the action of trover, and must be averred in the count. 3 Black. Comm., 152, 153; 1 Chit. Pl. ch. 2., title "Trover," pp. 135, 144; *Cooper* v. *Chitty, &c.*, 1 Black. R. 67; 1 Burr, 31, S. C.; 2 Tuck. Comm., ch. 6, p. 88. Now either the count is bad and the demurrer to it ought to have been sustained, or if it can be sustained as a count in trespass *de bonis asporatus*, then we insist that it cannot be united in the same declaration with counts in trover, and the demurrer to the whole declaration should have been for that cause sustained. No one we apprehend will maintain that at common law a count in trespass could be united with a count in trover. The rule on this subject is well settled. If the counts are not of the same nature or the same judgment cannot be given upon them all, whether the pleas be the same or different, they cannot be joined. 1 Chit. Pl. Ch. 2, title "Joinder of Actions," p. 179; 2 Saund. Rep., 117, e. And accordingly it has been expressly held, that trespass cannot be joined with case (of which trover is one species,) because they are two distinct things and of different natures, and the judgments are different, the judgment in trespass being *quod capiatur* and in trespass on the case *quod sit in misericordia.* 2. Saund., 117, e.; *Courtney* v. *Coller*, 1 Ld. Raym., 273, 274; *Cooper* v. *Bissell*, 16 John. Rep., 140. In the case last cited trespass *vi et armis* was joined with trover and the misjoinder was taken advantage of by writ of error.

But it may be said that by the statute, case may now be maintained where trespass will lie, and that therefore the distinction between the two forms of action is abolished, and a count in the one may well be joined with a count in the other in the same declaration. The premises could not be denied, but the conclusion would be a palpable *non sequitur*. The object of this statute was not to abolish the distinction between the two actions, but to extend the range of the election of actions which a party already had in certain

cases at common law. Its purpose was to remedy the mischief which had grown out of the difficulty experienced both by bench and bar, in determining what was to be regarded as an immediate and direct injury for which the remedy at common law was trespass, and what was consequential for which the remedy was case. It aimed to relieve parties of the hazard of deciding upon the question so much discussed in *Scott* v. *Shepherd*, 2 Black. Rep., 892; *Taylor* v. *Rainbow*, 2 Hen. & Munf. 425; *Jordon* v. *Wyatt*, 4 Gratt. 151, and other cases, by enabling them in such cases to maintain case whether the injury was of the one kind or the other. It gave the right to elect to bring case though trespass might have been maintained, but it was no part of the purpose of the statute to authorize both actions to be blended into one, or a count in the one to be joined with a count in the other in the same declaration. It left the subject of such joinder precisely as it was at common law. Now at common law, we know, a party had in many cases his election between several different actions either of which might be appropriate to his case. Thus upon an instrument under seal, he might often maintain debt or covenant at his election; so he might, in some cases, sue in case for a fraud practised upon him, or might waive the fraud and sue in assumpsit; so he might bring detinue, or if he chose to waive the right to the specific property he might bring trover; so in other cases, he might bring trespass *de bonis asportatis*, or he might waive the force and bring trover. Yet it never was supposed by any body that a count in covenant could be joined with a count in debt, or a count in assumpsit with a count in case for a fraud, or a count in detinue with a count in trover, or a count in trover with a count in trespass. The actions are different in their nature, or the judgments are different whether the pleas might be the same or otherwise, and such counts cannot be joined. And when the statute extended this right of election between remedies to the cases in which trespass might be maintained by giving the action of case, it left the pleadings to be determined by the same rules which would apply in cases in

228    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,          Hood, et. al. vs. Maxwell.          1866.

which the right of election existed at common law. But in truth the statute has no application to this case whatever. For the plaintiff might at common law have brought trover or trespass in this case at his election, independently of the statute, those remedies being concurrent. 2 Saund. R. 47 k.; *Bishop* v. *Montagne*, Cro. Eliz., 824; *Putt* v. *Rawsterne*, T. Raym. 472: *Rackham* v. *Jessup*, 3 Wils., 336, 1 Chit. Pl. 141.

There being then a palpable misjoinder of counts in this declaration, the demurrer to the whole declaration should have been sustained, and the court erred in overruling it. 1 Chit. Pl., ch. 2, title " Joinder of Actions," pp. 187, 188, and cases cited in notes; *Cooper* v. *Bissell*, 15 John. Rep., 146; *Henderson* v. *Stinger*, 6 Gratt., 130.

Upon the 3d point, we submit that the court improperly tried the cause as to *Mahaney* upon the issue made up as to the other defendants. He had been summoned but had failed to appear at rules, and an office judgment was confirmed against him and a writ of inquiry awarded. No issue was ever made up as to him nor was the writ of inquiry ever executed. Yet the jury were only sworn to try the issue joined as to the other defendants, and the verdict rendered upon the issue joined as to those defendants was accepted as a verdict against him also, and judgment rendered accordingly. This we submit was clearly error. We refer to *Wilkinson's adm'r* v. *Bennett*, 3 Munf. 314; *Totty's ex'or* v. *Donald & Co.*, 4 Munf. 430. Nor was the error cured by the statute of jeofails, for that statute, on this branch, only cures the want of a *similiter* or misjoining of issue. Here there was no plea, and the error was in rendering judgment against a party who had not pleaded, in an action sounding in damages, without executing a writ of inquiry, for the same damages found against others who had pleaded.

Upon the 4th point we insist that the mode adopted of proving the value of the wheat alleged to have been taken (a material fact in the cause) was illegitimate and improper. It was not a matter of professional or scientific skill and judgment as to which the opinion or deduction of an expert

is in some cases admitted as testimony, because of his supposed peculiar or better means of judging, but simply a matter of fact which might have been proven as well by any one who knew it. And if it had been a matter of skill and judgment, the witness was not proven to have been an expert. As well ask a witness at large to state his opinion of the value of raw cotton from the assumed price of cambric or muslin, or that of flax from the price of linen, or that of raw hides from the price of leather. We submit that the opinion or deduction to be made by the witness was too vague and indirect and too much in the nature of secondary evidence as to a matter of fact, to be admitted as testimony in the cause. 1 Stark. Ev., part 1, § 34, p. 54; part 3, § 10, p. 388; 1 Greenl. Ev. § 82, § 440 and n.

We come next to the 5th ground of error assigned, relating to the instrucitons asked for by the defendants in the court below. Of these the 1st, 2nd and 4th were *in pari materia*, and were in substance the same. By them the jury were to be informed that if they were satisfied from the evidence, the plaintiff below had parted with the goods under contract for the sale of the same, he could not recover in this action. It is difficult to imagine any reason why these instructions were refused. No one will pretend that if a party sell goods, he can recover the value in the action of trover if the purchaser fail to make payment for the same according to the contract. He can only recover in an action in form *ex contractu*, assumpsit or debt. It can scarcely be necessary to say that trover is in form *ex delicto*. It is for a *tort* or *maleficium* in the wrongful conversion. See Lord Mansfield's definition of this action in *Cooper* v. *Chitty & Blakiston*, 3 Burr., 31; 1 Black. Rep., 67, S. C. Nor can it make any difference that the sale took place after the goods came to the possession of the defendants, *Johnson, Burns* and *Mahaney*, as supposed in the 2d instruction. When the sale to the defendant, *Johnson,* was agreed on and the order given by *Maxwell* upon defendant *Hood*, for the price, the action of trover was gone, and the matter clearly placed upon the footing of a contract, and there certainly could be

no right to recover against *Hood* in trover, especially as there is no pretence of any demand upon him and refusal to deliver the property, the only demand proven to have been made being for the price of the goods as sold to *Johnson. Brewer* v. *Sparrow*, 7 Bam. & C., 310; *Clarke* v. *Clark*, 6 Esp. R., 61; *Rotch* v. *Hawes*, 12 Pick., 136, *Hewes* v. *Parkman*, 20 Pick., 90; 2 Greenl. Ev., § 642, n. 3. Now if as we maintain, these instructions propounded the law correctly, it was the right of the defendant below that they should be given in the form asked for, and error for the court to refuse them. *Balto. & Ohio R. R. Co.* v. *Polly Woods & Co.*, 14 Gratt., 447, 468; *Same* v. *Lafferty*, ibid., 478, 486.

The 3d, 7th and 8th instruction simply informed the jury that in the action of trover a conversion of the property or some part thereof by the defendants or some of them, must be proved to entitle the plaintiff to recover, and if a conversion of part only were proved, there could be a recovery for such part only. Now it surely is unnecessary to cite authorities to show that the conversion is the *gist* of the action of trover, and not only must be averred, but must be distinctly proved. We will only refer to 1 Chit. Pl., ch. 2, title "Trover;" 2 Saund., Rep., 37 e, 47 k; 2 Greenl. Ev., § 636, § 642; 3 Stark. Ev., title "Trover." What may amount to a conversion is a question of law, but that some act or acts must be proven which do amount to a conversion, is a proposition too familiar for argument or authority.

As to the 5th instruction asked for, all that we deem necessary to say is, that if it was not proved that *Hood* either took from or received of the plaintiff any of the property specified in the declaration,—if neither a caption nor a bailment of the goods was established as against him,—he was *prima facie* entitled to a verdict in his favor. If the plaintiff, however, expected to maintain before the jury that although *Hood* neither took nor received from the plaintiff any of the goods, yet that they came to his possession from others under such circumstances, and were so disposed of by him, or the possession so withheld or refused to be surrendered on demand made as would under the law make out

the conversion, it was his duty to move for a supplemental instruction to carry out his views, and it was not proper to refuse an instruction unexceptionable in itself, because in another view that the plaintiff might present, the defendant might be liable if the plaintiff's hypothesis should be borne out by the evidence.

The 6th instruction raises the question as to the personal liability of the defendant, *Hood*, for property taken by military authority as supplies for troops called into service by the existing government of the State of *Virginia*, and which came to his possession as commissary of subsistence. Upon the hypothesis of the instruction, certain troops, a portion of the militia of the State, had been called out by *John Letcher*, then Governor of *Virginia*, and the goods of the plaintiff had been taken for supplies for the use of such troops, and for that purpose had been received into the possession of *Hood*, in his capacity as commissary. Now, article 2, of the amendments to the constitution of the *United States*, declares: That, " a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed;" and the 16th clause of the 8th section of the 1st article of that constitution, reserves to the States respectively, the appointment of the officers and the authority of training the militia according to the discipline prescribed by Congress. By the 13th clause of the time-honored bill of rights of *Virginia*, it is declared that a well-regulated militia composed of the body of the people, trained to arms, is the proper, natural and safe defence of a free State; and by the constitution of *Virginia* (of 1851,) article 5th, § 5, the Governor is declared to be commander-in-chief of the land and naval forces of the State, with power to embody the militia to repel invasion, suppress insurrection, and enforce the execution of the laws. And by the code of *Virginia*, ch. 31, § 1, p. 167, (1st edit.,) provision is made authorizing the impressment of property, when supplies cannot be procured by contract in due time, for the use of troops when called into actual service, and the means provided for making compensation to the owner.

Now it is a part of the public history of the country, of which the courts will judicially take notice, that in May, 1861, *John Letcher* as Governor of *Virginia*, did call the militia of the State into active service, and that he required the forces from this section to rendezvous at *Grafton*; and it is a part of the hypothesis of the instruction, that the goods in question were received by the defendant, *Hood*, for the purpose of being disbursed or issued as rations to such troops, acting in obedience to the orders of the then Governor. Can it then be successfully maintained, that the militia-men, who, in obedience to the order of the then commander-in-chief, reported themselves for duty, and some one or more of whom either purchased supplies for the troops thus in service, or impressed the goods of the citizen, as such, by military authority, in pursuance of the Act of Assembly provided for the case, can be held personally liable to the owner for the value of the goods in any form of action whatever? · If we are to consider this a case of a sale of goods, and this were an action of assumpsit instead of trover, (and the cases cited above establish conclusively that although there be a wrongful taking, yet if the owner afterwards assent and sell the goods to the captor, the remedy in trover is gone, and that left him is by action on the contract,) it is a well settled doctrine that an officer contracting for government is not liable to be sued personally upon such contract.  It enures to the benefit of and is obligatory upon the government, not the officer, and this too even although the contract be under seal.  *Macbeath* v. *Haldimand*, 1 T. R., 172; *Unwin* v. *Wolsley*, 1 T. R., 674; *Hodgson* y. *Dexter*, 1 Cranch., 345; *Syme* v. *Butler's ex'or*, 1 Call., 105; *Tutt* v. *Lewis*, 3 Call., 233.  Or if there were no feature of a sale in this transaction, and it was one of a simple impressment of property, can there be any better reason for holding the impressing officers liable personally for the value of the goods in an action of trover, than there would be for holding them liable for the price in an action of assumpsit if there had been a sale?  Certainly the reasons so strongly stated by Chief Justice Marshall, in *Hodgson* v. *Dexter*, above

cited, for protecting the officer against personal liability in a case of contract, apply in all their force to the case of impressment of property for the public service; and no authority, we venture to say, can be produced for the contrary doctrine.

But we suppose these general principles will not be controverted, but it will be sought to be maintained that considering the time and circumstances of the call into service of the troops, being after the passage of the ordinance of secession by the *Virginia* convention, and for the purpose of maintaining the attitude thus assumed for the State, all parties who obeyed the call lost the protection of the laws providing for the ordinary military service of the State, and were mere trespassers in any act done by them that infringed upon the property rights of the citizen. But it will be remembered, and it is a part of the public history of the country, that the call was made by *Letcher* before the vote of the people was taken upon the ordinance of secession, and long before his proclamation was issued, declaring that it had been ratified by the popular vote; and whilst on the one hand, the most strenuous advocates of the alleged state right of secession would, it is supposed, scarcely contend that the ordinance had any validity or effect whatever until ratified by the vote of the people, and until the proclamation provided for was made by the Governor to that effect, those on the other, who maintain that by the consummation of that measure by the State authorities, the Governor and other State officers abdicated their respective offices and dissolved the State government; and still more readily those who maintain that the ordinance never possessed any legal validity whatever, was a mere nullity and *ipso facto* void, and therefore effected no change whatever in the relation of the State to the General Government, will agree that until the ordinance was consummated by the vote of the people, and the proclamation of the Governor issued thereupon, the attitude of the State towards the General Government was perfectly unchanged, and the constitution and laws theretofore in force remained in full efficacy and unimpaired. Upon

234          COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,          Hood, et. al. vs. Maxwell.          1866.

this point it is presumed there can be no difference of opinion. There must be some particular period, some *punctum temporis*, at which the constitution and laws of the State previously in force ceased to operate, and their protection was withdrawn from the citizen who acted in obedience to the orders of those in authority under them, and that period must have been at the consummation of the ordinance of secession by the Governor's proclamation. Now the call of *Letcher* for troops, as already stated, was made before the vote was taken upon the ordinance of secession, and the property in question was impressed probably before that day, and certainly some time before the proclamation issued which was intended to consummate the measure. The defendants had obeyed the call, as they supposed themselves bound to do, of the commander-in-chief, and it would seem most unreasonable to hold them to judge of the propriety of the call or the purposes for which it was made. Whatever these were, he was at the time Governor of the State, and had power and authority under the law to make the call and enforce obedience to it. In taking the property the parties were acting under his authority, with the statute sanctioning it in full force, and in receiving it from them the defendant, *Hood*, was acting strictly within the scope of his duties and office as commissary. To say that he would be liable in trover for property received under such circumstances is, as it seems to us, to confound all legal ideas, and may establish a precedent which would soon render it extremely unsafe for any citizen to yield obedience to the orders of constituted existing governmental authority in any case, or to exercise the functions of any office whatever, however important it might be to the public interest that it should be filled and its duties performed.

We think we do not transcend our duties as attorneys in saying, as we do, that we cannot resist the conclusion that this is an attempt on the part of the plaintiff to take advantage of the present unhappy condition of affairs, and of the odium which the defendants have brought upon themselves by their co-operation with those who had risen in resistance

COURT OF APPEALS OF WEST VIRGINIA.        235

Jan'y Term,        Hood, et. al. vs. Maxwell.        1866.

to the authority of the General Government, and indemnify himself at the hands of a jury for the loss which he had sustained, by casting it upon others who, under the law in ordinary times and circumstances, could not be held personally responsible for acts done in obedience to the orders of those in authority under the existing constitution and laws of Virginia.

Without further comment, we submit this question with confidence that when viewed in the calm light of reason and authority, and subjected to the test of that careful and deliberate investigation which we feel assured it will receive at the hands of this honorable court, but which we all know a question of such novelty and gravity can rarely, if ever, receive during the hurry and press of a jury trial in a circuit court, the solution will be in accordance with the views we have endeavored, however feebly, to present.

With regard to the last six instructions asked for, and which would appear from the bill of exceptions to have been passed over *sub silentio* by the court, we have only to repeat what is said in the petition, that they propounded the law correctly, as we think we have shown in what has been already said in the observations made upon some of the other instructions on which we have dwelt, and that if the circuit court was of that opinion, the defendants were entitled to the benefit of its opinion in the form of instructions to the jury as asked for. Or if the court thought otherwise, and that they did not propound the law correctly, it should have refused to give them in a formal and proper manner, so that the defendants could have had an opportunity of excepting to the court's opinion and testing its correctness in the appellate court.

Upon the last point made in the petition, having reference to the first instruction given by the court to the jury upon the prayer of the plaintiff below, we remark, that this instruction was evidently intended to conform to the views collected in 2 Greenl. Ev., § 545, from which the language used is mainly copied, but whilst it describes the modes of proof by which the conversion might be made out, it entirely

236 · COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,                   Hood, et. al. vs. Maxwell.                   1866.

ignores the necessity of proof that the goods were the property of the plaintiff. Greenleaf had in previous sections shown that it was essential to a recovery in trover, that the plaintiff should show property in himself and a right of possession at the time of the conversion, and then passes, in § 642, to the subject of the conversion. The hypothesis of the instruction is confined entirely to proof of the conversion, and the jury are told that if they were satisfied of that, they were to find for the plaintiff, without any allusion being made to the necessity of proof of title and right to possession. This might mislead the jury, and we submit was erroneous.

*D. Lamb* and *E. B. Hall* for the defendant in error.

There can be no objection to joinder of counts of trespass on the case, and trover and conversion: all the authorities sustain this view.

The third count is essentially a count in trespass *de bonis asportatis*, and under the 7th section of chapter 148 of the Code, it can be joined with the two first, which are clearly in trover and conversion. 1 Chitty's Pleading 197; 2 Id., 358.

Everything is presumed, unless the contrary appears on the record, to have been correctly done in the court below; therefore the objection taken in the second bill of exceptions is of no force, because it is to be presumed that the question propounded to the witness was in process of a regular examination; at least nothing to the contrary appears. It is not the duty of a court to allow such instructions as may require an explanatory instruction by the other party. Instructions are for the purpose of enabling the jury to arrive at a proper understanding of the legal rules to be applied to the case.

A military officer cannot excuse himself upon the ground of an order from a superior officer, apparently illegal on its face. 13 How., 136. Nor upon the ground that the necessity was urgent or danger imminent. Even admitting the authority of *Governor Letcher*, and that he had drawn the

COURT OF APPEALS OF WEST VIRGINIA. 237

Jan'y Term, Hood, et. al. vs. Maxwell. 1866.

forces into the field for a lawful purpose, which is unquali-
fiedly denied, nothing in the record shows any such necessi-
ties to have existed. 7 How., 4; 17 Curtis, 1; 2 Black's
Rep., 635; December No., 1864, Amer. Law Rep., p. 95.

BROWN, J. There is nothing in the 1st objection taken by
the plaintiff in error, that the court erred in not disposing
of the separate demurrers to the several counts of the dec-
laration; because the judgment on the verdict was a virtual
overruling of all the demurrers, if it had not before been
done: but I think the order of the court, though loosely
drawn, and yet, when considered altogether, sufficiently
shows that the court, in fact, overruled the whole demurrer,
as well to each count as to the whole declaration.

The 2nd objection taken by the plaintiff in error in his
petition, is to the 3rd count of the declaration—alleging it
to be bad as a count in trover, and also bad as a count in
trespass; but if not the latter, then the declaration was bad
for misjoinder. That count, though informally drawn, is
substantially good as a count in case, under the statute
authorizing case to be brought wherever trespass would lie:
and since counts in case and trover may be joined, there is
no misjoinder; and there was, therefore, no error in over-
ruling the demurrer to the declaration on that account. It
seems equally clear that the 3rd count is good under the
statute, as a count in trespass; for the distinctive features of
a count in trespass are the allegations, viz., 1st, of the taking
and carrying away; 2nd, with force and arms; 3rd, against
the peace, &c.; 4th, the *alia enorma*. Now by the statute
the 2nd, 3rd and 4th features may be omitted; and the
count in question contains the 1st. Thus the 3rd count
might be joined with a formal count in trespass, and also
with a formal count in case or trover: and no good reason
is perceived why things that are not inconsistent with the
same thing, should be inconsistent with each other.

It would seem to follow, as a consequence, that trespass
and case may be joined, under the effect of the statute;
which could not be done without it.

There is nothing in the 3rd objection of the plaintiff in error—alleging error in the court for trying the cause as to Mahaney, jointly with the other three defendants; because the judgment does not appear to have been against him, but only against the three defendants who had appeared by their attorney, and pleaded, and as to whom alone, the case was at issue, and which issue the jury were sworn to try; and not to inquire of the damages in the case of Mahaney, as to whom there was an office judgment, then not set aside. To have rendered judgment against Mahaney in such case, would have been wrong; and this court should not adopt a construction that would defeat the judgment, when any other construction equally natural may be given—and much more reconcilable with the facts and the pleadings in the cause. The maxim being—"*ut res magis valeat quam pereat.*"

Upon the 4th objection of the plaintiff in error, to the testimony of the witness who proved the price of the wheat per bushel by having the price of flour per barrel given him—without other proof that he was an expert—I have found more difficulty in arriving at a satisfactory conclusion. I think the question and answer in the 1st bill of exceptions go as far as the extremest limits will allow; but when it is considered that wheat and flour are articles of such universal acquaintance and use in this country, the presumption is that every man (not proved to the contrary,) is in some sort an expert in that matter. Not without some hesitation, therefore, I am inclined to sustain the ruling of the court, under the circumstances of the case, in permitting the question to be answered and the evidence to go to the jury.

The 5th objection taken by the plaintiff in error, is to the alleged refusal of the court to give the instructions asked by him on the trial, being fourteen in number.

It does not expressly appear whether the court gave or refused the last six of them: the inference is the court gave them: but whether so or not is wholly immaterial, since there is no exception taken for such refusal; and in the absence of such exception the party must be taken to have acquiesced in the ruling of the court below—whatever it

was—in that particular. The first eight of said instructions were refused, and the refusal excepted to. And here, before proceeding to consider the same, I will take occasion to suggest for the consideration of counsel generally in preparing bills of exceptions, how far the appellate court is bound to revise the rulings of the court below, when the record shows the case of a batch of instructions asked and refused, and a general exception taken to the refusal of the whole, but not several or separate exceptions taken for the refusal of each; even though it appear that some of the instructions so refused were good, and some bad. But as no such point has been made in this case, I do not feel called upon to express any opinion on the subject affecting the case.

The 1st of said instructions was rightly refused, because it assumes as a fact that, the plaintiff in the court below had sold the wheat and flour in question to defendant, Johnson.

The 2nd instruction was also rightly refused, because it assumes that, by giving an order on the defendant to pay for the wheat and flour, the plaintiff in the court below treated it as a sale, &c.

The 3rd, 4th, 5th, 7th and 8th of said instructions were rightly refused, because they do not propound the law fully; and are substantially, as far as proper, embraced in the instructions given by the court.

. The 6th and last objection taken by the plaintiff in error, is to the ruling of the court in giving the 1st instruction asked by the plaintiff in the court below; upon the ground that it did not sufficiently inform the jury that they must be satisfied that the property in question was the property of the plaintiff; but I think that does sufficiently inform the jury on that point; and when taken in connection with the other instruction given by the court, which informed the jury that, if they believed the defendants "unlawfully carried away the property of the plaintiff mentioned in the declaration," &c., there is no room left for doubt or misunderstanding; and that there was, therefore, no error in the ruling of the court in that particular.

The defendant's 6th instruction was rightfully refused, because the pretended authority of Mr. Letcher as Governor of Virginia, was no justification under the circumstances. In considering this subject, the court is bound to take judicial notice of the state and condition of the country at the time specified, viz: May, 1861; as well as prior and subsequent, so far as the same have relation to the case under consideration.

It is known, therefore, that at the time specified, hostilities existed and continued, and at least a *quasi* war was waged by a vast number of disloyal citizens against the United States; that those persons had usurped the powers and functions of several of the State governments; and among the rest of Virginia; and had confederated together in powerful organization to dissolve the Union, subvert the national government, and establish a separate and independent nation by force of arms. To that end they were carrying on open hostilites by military forces upon the most comprehensive scale. Into that combination and confederacy, His Excellency, John Letcher, Governor of Virginia, and as such Governor, with many other officers of State and a portion of the members of the legislature and convention entered. In the execution of the common design, they acted, and under his authority the defendants, acting as part of that hostile military force, committed the supposed grievances complained of; and now here vouch his authority as their justification.

The convention at Richmond, sitting in secrecy, had passed the pretended ordinance of secession, and negotiated a pretended treaty with the so-called confederacy; and in conjunction with the Governor, had taken steps to put the commonwealth on a war footing to resist the government of the United States in suppressing the insurrection and rebellion, while they invited soldiers of South Carolina, and other rebel States, in the service of the so-called confederacy, to enter the State and in connection with the Virginia troops hold military occupation of the commonwealth. This instruction, therefore, involves the consideration and deter-

mination of the grave and momentous question which has so recently agitated the country from centre to circumference. That is, whether a State has a constitutional right to secede from the Union. For if it has, then it follows that the seceding State is no longer a member of the Union, and may confederate as it pleases; nor do its citizens any longer owe allegiance to the national government, nor could they of right claim its protection under the constitution, however averse any of them might be to the change. If such right exists the convention of Virginia, at Richmond, exercised it, and the ordinances of the convention—the acts of the rebel legislature—the proclamations and orders of the Governor, and the acts of the officers, including the conduct of the defendants complained of, carrying it into effect, were justifiable and lawful. But if no such right exists; if the ordinance of secession, with all its concomitants, was unconstitutional and void, then was the authority void under which the defendants acted. And he who acts under a void authority must take the consequences, especially if in so doing he invades the rights of others. It is true that this absorbing and momentous question, after having been discussed in the senate hall, the cabinet chamber, and on the hustings, with as much zeal and ability as perhaps any other ever was, has been definitely decided by the legislative and executive departments of the national government and by most of the States also. It has also been tried at the grand assize of popular suffrage, and a true verdict rendered by the American people. And last, but not least, it has been tried and determined by the wager of battle. The courts too, it would seem, have frequently proceeded upon the assumption that no such right existed. Yet after all, no case is remembered, in which the judiciary has been forced, by the current of litigation, to consider and determine definitely this *questio vexata*.

It may be unfortunate that the judiciary first called to pronounce upon it, should be that of almost the youngest State in the Union; a State that has been called the child of the storm, and whose birth was the result of the convulsions

242    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,          Hood, et. al. vs. Maxwell.          1866.

produced by the question under consideration. I approach the subject, therefore, with diffidence and embarrassment; but with a firm resolution to shrink from no duty however delicate, and with a consciousness of no other desire than to do right.

Government is a necessity of man's nature, and not a mere caprice, however wisdom and experience may mould its structure or vary its application. Its perpetuity springs from its continued necessity, and is therefore an essential element of its nature. Hence, no people since the formation of the world have been known to exist without government in some form; and no goverment, not merely provisional, is known to have been formed for a limited period. The compact upon which government rests, whether between people or States. (or both, as in our case) is very different in its nature from that on which partnerships between individuals, and cartels, protocols, treaties, and alliances between governments stand. And perhaps the most striking feature of the difference is, that one is perpetual, the other temporary, in its nature and object.

The reservation of a right in any constituent party, to revoke at pleasure, without the consent of the rest, the powers of government delegated in perpetuity, would be no less inconsistent with the nature and object of the governmental compact, than with the proper exercise of the governmental functions. Such a right, if not so expressly reserved, could not be implied. Otherwise, every grant, however positive and express, might, by implication, conceal a reserved right to revoke it at the pleasure of any of the numerous grantors. An absurdity, so absurd, that like an axiom, its force is felt and its truth acknowledged without proof or argument.

The articles of confederation cemented a union of associated States; but the constitution of the United States constitutes a government of the people. To the former the citizens of the several States owed no allegiance, but only to the States. To the latter their allegiance is direct and immediate. The laws of the former spoke not to the people,

but only to the States; the laws of the latter command both States and people.  The former was dependent on the States to execute its resolves; the latter asks no extrinsic aid, but executes its mandates by its own inherent powers.  The former was " a perpetual union," the latter is "a more perfect union."  The former provided for our common defense; the latter in addition "established justice, and insured domestic tranquility."  The former guaranteed the rights of the States; the latter, in addition, also secured the blessings of liberty to the people and their posterity.

The constitution is the work of the fathers of the republic of which all are proud.  It is the bond of union, perfect in its nature and perpetual in its duration.  From it springs the obligations of the States and the allegiance of the citizens; while its ægis guards all alike against external force and internal violence.

As a judicial question there is none better settled than that the citizen cannot withdraw his allegiance without the consent of the government—expressed or implied; and if no one citizen possesses such right, the addition of any number of others similarly circumstanced could not confer what none possessed.  Nor could a State release its citizens from that allegiance, since the State itself is but the fractional part of a magnificent whole, and in its collective capacity is only the aggregation of its individual citizens; all of whom, as just shown, are alike incapable of effecting their own discharge, whether taken individually or collectively.  But secession, if allowed, severs the allegiance of the citizen, and makes him an alien with or without his consent.  It defeats the object of the constitution, destroys its perfection and limits its duration; it is wholly inconsistent with the powers granted under it.  Such a right, therefore, if it exist at all, must be expressly reserved in the constitution.  But no such anomaly is to be found therein. Can it be supplied by implication, upon the supposition that a power so extraordinary, inconsistent and subversive of the whole instrument, could have been overlooked or entirely ignored, if intended to be reserved, by the wise men who

framed that great charter of human liberty? Could it have been intended that all its powers, provisions and guarantees might be defeated by a concealed implication, which none ever mentioned, if any foresaw? It requires the credulity of delusion, with the aid of the aphorism "that the wish is father to the thought," to believe it. Neither was there any such right of secession reserved by any of the States in their respective ratifications of the constitution. The declaration of the convention of Virginia is clear and unequivocal, and precludes the conclusion. It asserts positively that, "the powers granted under the constitution are derived from the people of the United States, and may be resumed by them whensoever perverted to their injury or oppression." This is plain and practical. The people of the United States, granted specified powers for defined objects, with the right expressly reserved to resume those powers when the objects fail, and the powers shall be perverted to their injury or oppression. Such a reservation, is consistent with the grant, and if not expressed would be implied. But these statesmen, cautious to leave no room for doubt, expressed what they understood and determined.

Plain as the language is, like the constitution itself, it has not escaped misconstruction; but has been perverted by the advocates of secession to the support of that heresy: though it is believed, not without some qualms of conscience. For when those advocates went through the forms of a mock ratification of the constitution of the so-called confederacy, they resorted to language very different, clear and unequivocal, to express there the reserved right of secession. The language is, "but this constitution is ratified and adopted by Virginia, with the distinct understanding on her part, that she expressly reserves to herself the right, through a convention representing her people, in their sovereign character, to repeal and annul this ordinance, and to resume all the powers hereby granted to the confederate government, whenever they shall, in her judgment, have been perverted to her injury or oppression." There is no room to doubt the intent of the parties in the one case any more than in

the other; for both are equally clear and explicit.  The one sustains secession, the other excludes it.  If any doubt, let him look first on this picture, then on that.

That the ordinance of secession was repugnant to the constitution of the United States, is so plain that no one of ordinary intelligence and common honesty could, as it would seem, by possibility ever entertain a doubt.  For that constitution declares that, it is the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding; and all officers were sworn to support it.  It declares also, that the United States shall guarantee to every State a republican form of government, and protect each State against invasion and domestic violence; but secession repudiates this power and duty.

The constitution declares that, "the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States;" but secession abrogates these rights.  The constitution provides that treason against the United States shall consist in levying war against them, or in adhering to their enemies, giving them aid and comfort: but secession commands and compels the citizen to commit that highest of all crimes, on pain of confiscation, banishment and death.

The constitution says that, "no State shall enter into any treaty, alliance or *confederation*:" but secession did each and all of them in defiance of it.  The constitution declares that, "the President of the United States shall be commander in chief of the militia of the several States when called into service:" but secession said the president of the so-called confederacy only shall be such commander of the minor half.  The constitution provides that, "Congress shall have power to levy and collect taxes;" "To regulate commerce among the several States;" "To establish post offices and post roads;" "To constitute tribunals," &c.; "To raise and support armies:" "To provide for calling forth the militia to execute the laws of the Union, suppress insurrection and repel invasion:" but secession answers to all these express and important grants of sovereign power—not in this State,

nor in that, nor the other of the pseudo confederacy—no, not at all.

Recognizing the supremacy of the constitution, and laws made in pursuance thereof, the courts of the Union and of the several States, have uniformly held all acts repugnant thereto, to be utterly void; whether authorized by the laws or constitution of any State to the contrary notwithstanding. The instances of this kind have been numerous—their enumeration here is unnecessary.

The correctness of these rulings, the advocates of secession even, could not deny: but to avoid the force and obligation of the constitution, and the oath to support it, a resort is had to a subterfuge, which however fallacious, has been too successful in deluding many honest but prejudiced men, by assuming that a secession ordinance by a convention of the people of a State, was of higher import and obligation than a State law, or even than a State constitution: and was not therefore prohibited by, nor repugnant to, the constitution of the United States. And this subterfuge and delusion has been a fruitful source of untold evils: but has it any foundation in fact or reason? It would stultify the framers of the constitution, to suppose that in their grave efforts to provide a sure bond of union for the States, intended to be perpetual and perfect, they did their work so imperfectly as to leave a loop-hole through which any factious or recusant State could slip out at pleasure or caprice, by first changing a word, or calling the thing prohibited by another name. Instead of a law or a constitution of a State, call it a secession ordinance of a State convention, and at once the gordian knot was cut and the whole difficulty solved, satisfactorily. Wonderful sesame! that can by a magic word unlock the constitution and let the States slip out; that can cut the cords of individual allegiance and let the people go; that can absolve the oaths of all and give the conscience peace; but most of all, the wonder is, how easily it is done, by simply changing a word. Just call the thing by a different name and the deed is done—the end attained. *Columbus* did not more astonish and delight the baffled philoso-

COURT OF APPEALS OF WEST VIRGINIA. 247

Jan'y Term,        Hood, et. al. vs. Maxwell.        1866.

phers of his day, by the simplicity and ease with which he stood the egg on its little end, than these savans of secession did their deluded followers by their verbal solution.   Well might *President Tyler;* on a certain memorable occasion, and in reference to another important constitutional difficulty, urge upon his cabinet that "there was much in a name." But let us deal with the substance rather than the sound; the thing rather than the name.   What is a State constitution, but the most solemn ordinance of a State convention, ratified by the people of the State?   And what is this secession ordinance but a secret ordinance of the State convention; and for the sake of argument only, let it be admitted to have been ratified by the people of the State, fairly, freely and deliberately, and without duress, force or fraud.   The agencies by which the organic acts in both cases are prepared, proposed and passed, to-wit: the conventions, the people by which they are adopted and ratified, and the power by which they are ordained, are the same.   How, therefore, can one be more potent than the other, to annul the supreme organic law of the land?   To the plain common sense of mankind, it would seem impossible, ridiculous, absurd.

Upon the most mature consideration of the whole subject, I am brought to the firm conclusion that, the right of secession is a cant myth—an *ignis fatuus*—a dangerous delusion—a costly experiment—a miserable abortion—a doctrine that has no foundation, save in the disordered imaginations of its votaries, and has been fraught with more evils than any other ever invoked; that the secession ordinance in question, was repugnant to the constitution and therefore void; and that all who acted under it, or in execution of it, acted without authority, and are responsible for their conduct to those concerned.

But again, the loyal people of Virginia by their delegates in convention assembled in the city of Wheeling, declared and ordained that, all the ordinances, &c., of the Richmond convention, were illegal and void, and without the authority of the people of Virginia constitutionally given, and in derogation of their rights.   The action of that convention,

which is destined to mark an epoch in our existence, has been recognized and accepted by the people of the old State and the new—by the east and the west—and also by the government of the United States in all its departments, legislative, executive and judicial. That convention was big with the fate of two Virginias, if not of the Union. Its action was momentous beyond a parallel. Its legitimacy is now beyond cavil. It is too late to question its validity, if any felt disposed, and certain it is that I do not.

Whether, therefore, we consider the secession ordinance and action of the Richmond convention, as void because repugnant to the constitution of the United States, or void by the declaration and mandate of the Wheeling convention, it can furnish no authority to justify or authorize Mr. Letcher, or Colonel Porterfield, or the military command under him, of which the defendants were part, to carry on hostilities against the United States; and in the execution of such design, to seize and appropriate the property of the plaintiff.

I think, therefore, that there was no error in the refusal of the court to give the 6th instruction asked by the defendants in the court below; and that the judgment ought to be affirmed.

The other judges concurred with Brown, J.

JUDGMENT AFFIRMED.