## DANIEL BURKHART, *et al. vs.* JAMES H. JENNINGS.

### July Term, 1867.

1. In an action for damages for suing out a writ of attachment, it is essential to allege in the declaration that it was sued out maliciously and without probable cause.

2. Where there are two or more counts in a declaration and a demurrer is entered to each count separately, they must be respectively regarded as separate declarations; and the demurrers to defective counts ought to be sustained, whatever may be thought of the rest.

3. Justifiable probable cause for suing out an attachment defined to be, a belief by the attaching creditor in the existence of the facts essential to the prosecution of his attachment, founded upon such circumstances as, supposing him to be a man of ordinary caution, prudence and judgment, were sufficient to induce such belief.

4. It is improper to admit evidence to show that the defendant was instigated by malice in suing out an attachment, when malice was not alleged in the declaration.

5. No act of the General Assembly of Virginia, passed after June 20th, 1863, the date of the foundation of the State of West Virginia, can give validity to the acts of persons acting as officers without authority in 1861, within the limits of West Virginia.

6. The acts of persons who acted as officers and adhered to the government of Virginia at Richmond, after the 13th of June, 1861, are null and void, having been so declared by the ordinance of that date, passed by the convention of the loyal people of Virginia then assembled.

In August, 1865, *James H. Jennings* sued out of the clerk's office of the circuit court of *Berkeley* county, a writ in trespass on the case, against *Daniel Burkhart, William D. Burkhart, John W. Stewart, Adam Small, Thomas P. Hollis,* and *Daniel Lafever.*

*See page 187.

The first count in the declaration, filed at the September rules following, alleged that, on the 20th day of September, 1861, the defendants contriving and wrongfully and injuriously intending to harass, oppress and injure the plaintiff without good cause, did sue out one writ of attachment against the property, goods and chattels of the plaintiff, before one *George Doll,* acting as a justice within the county of *Berkeley,* but without legal authority, alleging and swearing that the plaintiff was justly indebted to the *Bank of Berkeley* in the sum of 1000 dollars, with certain charges of protest, and interest; and that to the best of affiant's belief, the plaintiff was about removing his effects out of the commonwealth, (the commonwealth of *Virginia* meaning,) so that there would not be sufficient effects, &c., And that having obtained such writ of attachment, under color of it the defendants siezed, took and levied upon, and caused the same to be done, certain real and personal property of the plaintiff of the value of 18,000 dollars: Whereas, in truth and in fact, the plaintiff was before and at the time of committing said grievances by the defendants, a citizen of the aforesaid county and State, and was possessed of a large amount of property, comprising among other things four valuable farms, slaves, &c., of the value of 25,000 dollars: and that the plaintiff was not removing, and did not intend to remove or dispose of it; but that he was willing and anxious to discharge the said indebtedness to the *Bank of Berkeley* in full, whenever allowed to do so, but was prevented from doing so by the presence of a large body of armed rebels; and that the defendants did not properly inform themselves of the whereabouts and purposes and intentions of the plaintiff before suing out the said attachment.

There were three other counts in the declaration, but they were on matters of special damage, and do not seem to have been considered by this court. The plaintiff claimed 5,000 dollars damages.

The defendant *Lafever* filed a separate plea in May, 1866, alleging that at the time of the suing out of the writ of attachment, which had been levied by a constable, he was

sheriff of *Berkeley* county, and that judgment and an order of sale against the property levied upon, had been entered by the circuit court of that county in September, 1861, in the cause, and as such sheriff, he had taken possession of the property levied on, by virtue of the order of sale, directing him to make sale of the same. To this the plaintiff replied, denying that at the time of the levy *Lafever* was the sheriff of *Berkeley* county, or that any attachment ever issued by any lawful or competent authority; or that any judgment or order of sale was ever made in any such cause, by any court having any lawful power or authority to exercise any jurisdiction over his property or person. On the 5th of June, 1866, the defendants entered the plea of not guilty, upon which issue was joined, and the defendants also demurred to the declaration and each count separately, which demurrers were overruled by the court, except as to the second count, which was sustained. The defendants moved the court to strike out certain portions of the first count, but the court refused to sustain the motion as to all of the portion sought to be struck out.

A jury being called rendered a verdict for the plaintiff for 1,450 dollars, with interest from the 20th day of September, 1861.

There were five bills of exceptions taken by the defendants:—

The first stated that the defendant having introduced in evidence an act of the General Assembly of Virginia, passed the 28th of February, 1866, entitled "an act to give effect to certain acts, contracts and proceedings during the war," asked the court to instruct the jury that, if from the evidence before them they believed that the cause of action arose in the county of *Berkeley* and State of Virginia, on or about the 20th day of September, 1861, and that the plaintiff had not alleged or attempted to prove that he had any cause of action against the defendants subsequent to the 1st day of January, 1862, that then the rights of the parties with the evidence and legality of the proceedings upon which it was asserted and resisted, were to be controlled by the

laws of Virginia; and even if it should have been made to appear that the warrant of attachment was defective, because of want of authority in the officer who issued the same, that it was competent for the State of Virginia to correct such defect of authority by legislation, and to give validity to such acts, and that the law passed on the said 28th day of February, 1866, did correct such defects of authority, if any existed. Which instructions the court refused to give.

The second bill of exceptions stated that, the plaintiff having introduced evidence tending to show that the defendants acted without probable cause, and were instigated by malice in suing out the attachment, the defendants moved the court to instruct the jury that, inasmuch as no malice was alleged in the declaration, that all evidence tending to show malice on the part of the defendants, should be excluded from their consideration. Which the court also refused to give.

The third bill contained the exception to the ruling of the court in refusing to strike out certain portions of the first count, but the point was not insisted on in this court, and was not considered.

The fourth bill related to proof of certain rumors at the time of suing out the attachment, but it was not maintained by the defendants, in this court.

The fifth exception stated that, after the defendants had offered evidence tending to prove that the justice who issued the attachment, and all the other persons who had entered judgment or order of sale, and had sold the goods of the plaintiff, were duly constituted officers prior to the late rebellion, and whose terms of office had not expired under the laws of *Virginia*, by virtue of which they had been elected or appointed to such offices, at the time of the attachment, levy, order and sale; and that the State of *Virginia* and the so-called Confederate States, had control over and held possession of the county of *Berkeley*, in which the attachment issued, and the so-called governments were at war with the government of the *United States.* The defendants asked the court to instruct the jury as follows:

"The court instructs the jury that if they believe from the evidence that at the time of the suing out of the attachment referred to, and the order of the circuit court thereupon, and the subsequent sale under such order, the justice of the peace issuing said warrant of attachment, and the judge of the circuit court ordering said sale, and the officer executing said order of sale and levying said attachment, were officers who were duly constituted as such prior to the late rebellion, and whose terms of office had not expired under the laws of Virginia, by virtue of which they had been elected or appointed to said offices at the time of said attachment, levy, and order; and there existed at that time, and prior thereto, no other *de facto* government under which said officers acted than that of the said State of Virginia and the so-called Confederate States, which governments had control over and held possession of the county of *Berkeley*, in which said attachment issued; and that said *de facto* governments were at the time at war with the government of the United States, and the government styling itself, or so generally denominated, the restored or reorganized government of Virginia; then the authority of said officers and court in said capacities was not affected, and is not now affected, by any ordinance or enactment of any other organization or government to enforce its power or authority over said county." The court also refused this instruction.

The defendants obtained a writ of supersedeas from this court.

*Charles J. Faulkner,* on behalf of the plaintiffs in error, maintained.

1st. That the circuit court erred in not sustaining the demurrer to the first count of the declaration.

The first count was intended to present a case of malicious prosecution. It avers that " the defendants contriving and wrongfully, and injuriously intending to harass, oppress and injure the plaintiff, *without good cause,* did sue out and cause to be sued out, one writ of attachment against the property of the plaintiff," &c. It falls precisely within

the objection taken to the declaration in the case of *Spengler* vs. *Davis*, 15 Grattan, 381. In that case, the declaration charged that *Spengler* "wrongfully and without good cause," sued out an attachment against the property of the plaintiff. Judge Daniel declaring the unanimous opinion of the court, says, "the declaration is irregular in that, it charges that the attachment was sued out *wrongfully and without good cause,* instead of *maliciously and without probable cause.*" And after reviewing the several cases decided by the Court of Appeals of Virginia, he says that "the words *without probable cause,*" or some equivalent expression, are essential to make a good declaration, and that without them, it is radically defective. Same case, page 396, and the cases there cited.

2d. The circuit court erred in permitting the plaintiff to introduce evidence to show that the defendants were instigated by *malice,* in suing out the attachment complained of in the first count of the declaration. A plaintiff can only recover *secundum allegata,* and can legally *prove* no material fact which the declaration does not allege. The declaration in this case, in no part of it alleges that the attachment was sued out *maliciously,* nor does it aver that it was sued out "without probable cause," from which malice might be implied. There was, consequently, nothing in the declaration which gave to the defendants notice of the introduction of such evidence, and they were necessarily taken by surprise by it. The words "wrongfully," "injuriously," "without just cause," "without good cause," have been over and over again decided not to imply that which the law terms *malice.* Gilbert Reports, p. 190; 3 Call. 3 & 446. 15 Grattan 387, 396.

3d. The court erred in refusing the instruction asked for pp. 16 and 17 of the printed record. The official act which was the subject of enquiry, occurred in Virginia on the 20th of September, 1861. The validity of the act was determinable alone by the laws of Virginia. He was acting as an officer of that State, and if any doubt existed as to the validity of his official acts done in 1861, they were removed

by the law of the 28th of February, 1866, and the court should so have instructed the jury.

4th. The court erred in refusing the instruction embraced in pages 20 and 21 of printed record. An officer *de facto*, is one who exercises the duties of an office under color of right by virtue of an appointment or election to that office, being distinguished on the one hand from a mere usurper of an office, and on the other, from an officer *de jure*. In this case, the judge, justice and sheriff, were all, at least *de facto* officers. The principle is well settled in regard to such, that third persons claiming under their acts, are required only to show that they assumed to be officers, and acted as such. The failure of an officer to take the oaths prescribed by law or by the constitution, does not invalidate his acts so far as third persons are concerned. *Riddle* vs. *Bedford County*, 7 S. and R., p. 392; *Neale* vs. *Overseers*, 5 Watts, 539; 2 Hilliard on Torts, 232, 196; 1 Greenleaf Evidence S. 92; *Cocke* vs. *Halsey*, 16 Peters, 85; 1 Denio, 579; 5 Hill, 616; 9 Johnson, 549; 5 Wend., 231; Lutw., 508–19. The case from 38 Missouri Reports, decided July term, 1866, being based upon an ordinance similar to our own, is particularly forcible and in point. *Harbaugh* vs. *Winson and others*, page 331.

The rule imparting validity to the acts of a *de facto* officer is indispensably necessary to prevent a failure of justice. The business of the community could not be transacted without it; irreparable wrong would result from any other doctrine. Same case.

As early as the Henrys, in England, this doctrine had become firmly established, and was founded upon the maxim *Salus populi suprema est lex*. Jenkins in his ancient reports, third century, case 66, thus states the doctrine: "Judicial acts done in the time of the usurper, bind the right king. The crown was tossed between the two families of York and Lancaster for many years, and yet the acts of royalty and government done in the reign of the several competitors were confirmed by the respective parliaments. These resolutions were made to avoid *anarchy and confusion*. By all the

judges of England. *Salus populi suprema est lex.*" Jenkins' Reports.

*Stanton & Allison,* for the defendant in error, said:

The plaintiff, to reverse the decision of the court below, relies with apparent confidence upon the case of *Spengler* vs. *Davis,* 15 Grat., 381. The only points in the syllabus of that case, having any bearing on this case, are as follows:

"Justifiable probable cause for suing out an attachment against the effects of a debtor is, a belief by the attaching creditor, in the existence of the facts essential to the prosecution of the attachment, founded upon such circumstances as supposing him to be a man of ordinary caution, prudence and judgment, were sufficient to produce such belief.

"The improper motive, or want of proper motive, inferrible from a wrongful act based upon no reasonable ground, constitutes of itself all the malice deemed essential in law to the maintenance of the action for malicious prosecution.

"In an action for maliciously suing out an attachment against the effects of the plaintiff, the declaration alleges, that the attachment was sued out 'wrongfully and without good cause,' instead of 'maliciously and without probable cause.' Though this was irregular, it is cured by the verdict."

We claim this case sustains the judgment below. The plaintiffs here rely on the remarks of the court, or Judge Daniel, on page 382, as follows: "The declaration in this case is irregular, in that it charges that the attachment was sued out *wrongfully and without good cause, instead of maliciously and without probable cause.*"

These remarks are correctly quoted, but it will be seen that in the opinion of the court, it was a mere *irregularity*, but not a radical defect. The court held that it was cured by verdict. This is equivalent to holding, that although by the common law system of pleading a *special* demurrer would be sustained for the irregularity, yet under the Virginia Code, it is sufficient. A verdict simply cures such matters as could be taken advantage of by *special* demurrer,

not matters for which a general demurrer would be sustained.    Special demurrers are in effect abolished.    Title 51, chap. 171, sec. 31 of the Code, p. 712, declares:

"On a demurrer (unless to a plea in abatement) the court shall not regard any defect or imperfection in the declaration or pleadings, whether it has been heretofore deemed mispleading or insufficient pleading or not, unless there be omitted something so essential to the action or defence that judgment according to law and the very right of the cause, cannot be given."

Chap. 181, sec. 3, of the Code, p. 743.    No judgment or decree shall be stayed or *reversed* "for any defect, imperfection or omission in the pleadings, *which could not be regarded on demurrer,* or," &c.

Now it is said that the gist of the action is malice, and want of probable cause.    These are, in the opinion of the court, substantially and sufficiently alleged, although "irregularly," for the court say, upon page 398, drawing a distinction between previous decided cases and the one then before the court, "The distinction between such cases, and the one in hand, is too marked to require comment. *Proof that the attachment was prosecuted maliciously,* and without probable cause, would be *entirely consistent* with the allegation that it was prosecuted wrongfully and without good cause; and it might well be that the very same testimony relied on to establish the latter allegation, might furnish sufficient proof of the former also."

But the plaintiffs claim that on page 398, the court say "that the words 'without probable cause,' or some equivalent expression, are essential to make a good declaration, and that without them, it is radically defective."    If the court had so said, it would be a sufficient reply to say that the court in that case decided that the words "wrongfully and without good cause," *were* equivalent.    But the plaintiffs misunderstand the court.    They are simply quoting from previous cases referred to, and then say, "it is to be observed however, of *all these cases,* that they were decided in the absence of some of the most sweeping of the provisions of

our present statute of jeofails," &c. "Still it will be seen, on a reference to the cases alluded to, that *none of them can be used as precedents for excluding this case from the benefit of said provision.*" [Code, 743, above quoted.]

The remedy of the attachment debtor for a wrongful attachment by an action for a malicious prosecution, is not affected by the execution of the bond, but that remedy still subsists. Drake on Attachments, §§ 154 and 726. It should be held, that, in Virginia, and other States, the common law rule that an attaching creditor was only liable in damages, where the attachment was issued "*maliciously and without probable cause,*" is changed or modified by the legislatures, as is shown by the prescribed conditions for the bond, when executed by the creditor. He is required to give bond conditioned "to pay all costs and damages which may be awarded against him, or sustained by any person, by reason of suing out the attachment;" [Code, 647, sec. 8;] and by the following: "If property be taken under any attachment sued out without good cause, the owner of such property may, in an action against the party suing out the attachment, recover damages for the wrongful seizure, and for the sale thereof." Code 635, sec. 3. This renders him liable for all damages, whether issued maliciously and without probable cause or not. So held in Alabama, and *that* in actions on the case, and not on the bond. Drake on Attachments, sec. 157, and the following Alabama authorities: *Wilson* vs. *Antlam,* Minor, 367; *Kirksey* vs. *Jones,* 7 Ala., 622. In this case the declaration charged "that the defendant, without any just or probable cause, procured an attachment to be issued and levied on plaintiff's property." Held sufficient, and not essential to prove malice—and that defendant was liable if wrongfully sued out.

In the above case of *Kirksey* vs. *Jones,* action on the case for suing out an attachment without any reasonable or probable cause, and for the purpose of vexing and harassing the plaintiff. Held, that the expression of the legislative will, in designating the terms of the bond, indicated that the mere wrongful recourse to this process was a sufficient

cause of action, and that notice was important only in connection with the question of damages.   See also *Seay* vs. *Greenwood*, 21 Alabama, 491.

In *Hill* vs. *Rushing*, 4 Ala., 212, and 11 Ala., 495, the court held that actions on the bonds are governed in all respects by the rule established in actions on the case, except the recovery, which could not exceed the penalty of the bond. Drake, sec. 157.

In Louisiana the same views have been expressed as in Alabama, and it is held, that where no malice exists, the actual damage sustained may be allowed; if malice exists, vindictive damages may be recovered. Drake, sec. 159, and authorities there cited.

In Missouri, New York, and Ohio, the same doctrine has been held in actions on the bond.

Otherwise in Tennessee—Drake, § 160—and Virginia in the earlier cases of *Young* vs. *Gregorie*, 3 Call, 446; *Boon* vs. *Maul*, Pennington, 631, New Jersey; but as the court remark in 15 Grattan, 381, these cases were all previous to our present liberal statute of jeofails.

Malice, and want of probable cause, *are* substantially averred.

The first count alleges that the defendants "contriving and wrongfully and injuriously *intending* to harass, oppress and injure the said plaintiff in this behalf, without good cause, did," &c., before *George Doll*, "acting as a justice without legal authority," and "under color of process of such attachment, wrongfully and injuriously seized," &c.   These allegations, including the excessive levy, certainly are equivalent to a charge that it was maliciously done.   The want of probable cause is clearly shown from the statements that *Jennings* was about to remove his effects out of the commonwealth, so that there would not probably be sufficient effects left to satisfy his claim of 1000 dollars. [No allegation that he was about to dispose of, or put his property out of his hands, but he was about to remove it.]   The levy on 657 acres of *land* in that county, worth much more than the debt, besides a large amount of personalty, worth in all 18,000 dollars,

that in fact defendant owned in that county 25,000 dollars worth of property, and was not removing, and did not intend to remove any part of it, or to dispose of it—that he was ready, willing and anxious to pay and discharge the full amount of his indebtedness when allowed to do so, but he was prevented by the presence of a large body of armed rebels, and that defendants did not properly inform themselves of his whereabouts, purposes and intentions.

The third count clearly shows the malicious intent as in the first count, and shows the entire absence of probable cause, at least as to a large amount of the property seized. There was at least 16,000 dollars in value in the county and seized, whereas one-tenth of it would have been enough.

But this count and the fourth count were probably designed by the pleader, (and the same may be said of the first count,) as good in trespass for seizing plaintiff's property without legal process, because the justice was a rebel, and was not an officer recognized by the restored government of Virginia.

The fourth count is clearly good to recover damages, if the defendants were liable in trespass. So also is the third count. The first count is good for either trespass or case. But if one of the counts can only be sustained because good for a trespass, and another only because good in trespass on the case, the declaration is good for trespass, and case can be joined. *Hood et al. vs. Maxwell,* 1 West Va. Rep., 237; *Parsons vs. Harper,* 16 Grattan, 64.

But in addition to the common law rights of action in trespass for wrongfully seizing property without lawful authority, and for maliciously prosecuting an attachment without probable cause, the Code of Virginia, page 635, ch. 148, sec. 3, creates an additional cause of action for *wrongfully* seizing property under an attachment "sued out without *good* cause." Drake, §§ 157, 158, and Alabama and Louisiana authorities cited.

The first count in trespass on the case is good under that section of the Code, and perhaps was framed under it. The third count also.

The Virginia Code more clearly creates a new cause of action than the statute of Alabama; for in the latter State it was done inferentially by prescribing a condition to the attachment bond, whilst in Virginia it is done by a direct provision authorizing an action in such a case. *Parsons vs. Harper*, 16 Grattan, 64, July term, 1860; Lee, Judge.

This case, we think, sustains us upon all the points made, and sustains the record in this case.

The bill of exceptions on pages 16 and 17 of printed record, simply raises the question whether an act of the legislature of Virginia, passed February 28th, 1866, declaring the effect of, or correcting defects of authority, and to give validity to certain official acts, has any effect or force beyond the territory of Virginia as it stood in February, 1866. It was not the intention of the legislature that it should have any extra territorial effect, and whether it did or did not, it cannot have any effect as to acts of persons within the territory of West Virginia.

The bill of exceptions on pages 20 and 21 of the printed record, attempted to make valid their acts as *de facto officers*, but the ordinances and laws of the restored government of Virginia clearly made them illegal.

But does the record before the court properly make these points? The facts in proof are not in the record; the verdict is general, and judgment is good upon any one count. It can be sustained, say under the first count, and under this it makes no difference whether the officers had authority or not.

BROWN, President.

The attorney for the plaintiffs in error, having in the argument of the case, expressly waived the consideration of all the other questions made, or that might arise on the record, except the four points stated in his printed brief, the first of which is, the alleged error of the court in overruling the demurrer to the first count of the declaration, I have not felt called on, therefore, to look further into the record than

was necessary to understand and determine the errors complained of.

The first count was intended to present a case of malicious prosecution, and is liable to the objections taken to the declaration in the case of *Spengler* vs. *Davis*, 15 Grattan, 382. In that case, the declaration alleged that Spengler "wrongfully and without good cause," sued out an attachment. The court said, "The declaration is irregular, in that it charges that the attachment was sued out *wrongfully* and *without good cause*, instead of *maliciously* and *without probable cause*." The court then reviewed the cases decided in Virginia. In the case of *Ellis* vs. *Thilman*, 3 Call, 3, (which was a case for malicious prosecution) the allegation was that the prosecution was *malicious* and *without any just cause*. In the case of *Young* vs. *Gregorie*, *Id.*, 446, (case for the illegal suing out, &c., of an attachment,) it was alleged that the proceedings were had *maliciously* and without any legal or justifiable cause. And in *Kirtley* vs. *Deck*, 2 Munford, 10, (case for a conspiracy in preferring, &c., a malicious prosecution for a felony), the allegation was, that the defendants falsely and maliciously conspired, &c., to prefer a false and malicious prosecution, &c., but there was no averment that the prosecution was without *probable cause*. In each of these cases it was held that the words *without any just cause*, in the first case mentioned, and *without any legal* or *justifiable cause*, in the second, could not be received as equivalents for the words which the law required.

These cases were decided in the absence of some of the provisions of our present statute of jeofails, which provides that, *after verdict*, no judgment shall be stayed for any defect whatsoever in the declaration or pleading, whether of form or of substance, which might have been taken advantage of by demurrer, and which shall not have been so taken advantage of; which was first enacted at the revisal of 1819, and was afterwards re-enacted in 1849, with slight modifications, not necessary to be noticed here. Code of 1849, p. 680.

This statute cures defects after verdict which might have been taken advantage of on demurrer, but which were not

so taken advantage of; but leaves the question still to be ascertained whether the defect in the first count of the declaration, is such matter of substance as can be taken advantage of on demurrer.

By the statute of jeofails, before the revisal of 1819, it was provided, that the court on demurrer, shall not regard any other defect or imperfection in the declaration, than what was specially alleged in the demurrer, unless something so essential to the action, as that judgment according to law and the very right of the cause could not be given. Dec. 4th, 1789, ch. 28, 13 Stat. at Large, 37; 1792, ch. 76, R. C.; 27 Eliz., ch. 5; 4 and 5 Ann, ch. 16.

It was under the influence of this statute the cases reversed were decided. Its effect was to cut off special demurrers, but not general. And it was held that on a general demurrer every advantage might be taken, that could be done, on motion in arrest of judgment, and no other. Lyons, J., in *Roe* vs. *Crutchfield,* 1 Hen. and Munf., 367; *Baird* vs. *Mattox,* 1 Call, 264, and see *Collins* vs. *Gibbs,* 2 Barr, 899; *Bodwell* vs. *Parsons,* 10 East., 363-4; *Kennaird* vs. *Jones,* 9 Gratt., 189.

According, therefore, to these decisions, made in view of the statute of jeofails, above cited, in actions for malicious prosecution, it was matter of substance, and essential that the declaration should allege the acts to have been done *maliciously and without probable cause;* and it is equally clear that the words *wrongfully* and *injuriously, without good cause,* as used in the declaration at bar, are not equivalents for the words which the law required. I also think the doctrine too long and well settled in Virginia, and this State, to be disturbed by the cases cited in the argument from Alabama and Louisiana, where they seem to have departed from the common law, under the provision of their statute. I think the first count, therefore, fatally defective.

If there had been only a general demurrer to the declaration, containing several counts, the demurrer should have been overruled and judgment entered on the good count, if any such in the declaration. *Roe* vs. *Crutchfield,* 1 Hen.

and Munf., 364; 8 Leigh, 93. But where there are two or more counts, and there is a demurrer to each, each count must be regarded as a separate declaration, and must be disposed of accordingly; [same case]; *Kennaird* vs. *Jones*, 9 Grattan, 187. And in the case at bar, there were several counts, and separate demurrers to each, and the first being defective, whatever may be thought of the rest, the demurrer to the defective count should have been sustained. For a legal definition of probable cause, and the policy of the law in requiring it, see case of *Manns* vs. *Dupont*, 3 Wash., C. C. R., 31, and opinion of Daniel, J., in *Spengler* vs. *Davis*, 15 Gratt., 388. The latter says: "We may, I think, properly define justifiable probable cause in cases of the kind to be, a belief by the attaching creditor, in the existence of the facts essential to the prosecution of his attachment, founded upon such circumstances as supposing him to be a man of ordinary caution, prudence, and judgment, were sufficient to induce such belief."

The second objection is to the admission of evidence to show that the defendants were instigated by malice in suing out the attachment complained of in the first count of the declaration.

It would seem to follow as a necessary consequence, that if the first count was bad, for want of the averment of so important and essential a matter as malice and probable cause, in suing out the attachment, that it would not be admissible to prove such a state of facts, not alleged in the pleading, and thus recover for what was not charged. That would be to violate the principles of pleading, and work confusion in judicial proceedings.

The third objection raises the question of the validity of the Virginia act of February 28th, 1866, to give effect to the acts of persons acting as officers without authority of law in 1861. No act of the Virginia legislature passed after June 20th, 1863,—the date of the formation of the State of West Virginia,—can have effect as law in the latter. Within the territory of West Virginia, her laws alone prevail in harmony with the laws of the Union. Had the act in ques-

tion emanated from the legislature of West Virginia, it might have presented a very different question.

The fourth objection is to the refusal of the court to give the instruction asked by the defendants below touching the validity of the official acts of the defendents assuming to exercise the functions of officers under the authority of the rebel governments.  The instruction is so involved and confused as to render it uncertain and difficult to determine what proposition of law it propounded, and was rather calculated to confuse and mislead the jury than enlighten them upon the law of the case.  I think, therefore, for that reason, if there had been no other, that it was rightly refused. It seems to involve a diversity, as well as a confusion of views; but if I am able to extract from it any distinct proposition which it is sought to propound as law, it is this:— That the ordinance of the convention of the loyal people of Virginia, of the 13th of June, 1861, was not competent, *proprio vigore,* to vacate the offices of the persons, respectively, who as justice, issued the attachment, as judge ordered the sale, and as sheriff executed the levy and order of sale. And the reason assigned is, that they were officers of a *de facto* government, then at war with the government of the United States and the government of Virginia, and that the said *de facto* government then held possession and control of the county of Berkeley, in which the said attachment issued and the proceedings under it were had.

It has long been a fundamental doctrine with the people of Virginia, that the powers of government spring from the people, and may be exercised only for their happiness and safety; that magistrates are the trustees and servants of the people, and at all times amenable to them.  This was declared, in substance, by the Grand Assembly, as early as the time of the English commonwealth in 1652, in 1658, and in 1659–60, and again by the convention of June, 1776; was reaffirmed by the convention of 1830, by the convention of 1851, and again by the convention of June, 1861.  1 Hen. Stat. at Large, 372, 503, and 531; Virginia Bill of Rights, Code 1860; Declaration of People of Virginia, (ordinance

of convention, 1861); and also by the people of West Virginia in their constitution, in June, 1863.

The convention of 1861 put forth the ever memorable declaration of the people of Virginia,.destined to be as enduring as the history of the momentous events which gave it birth.  Fit compeer of the preamble to the constitution of June, 1776.  It announced the solemn fact that the convention at Richmond had usurped and exercised the powers of government to the manifest injury of the people, and to the peril of their liberties; that it required them to wage war against the Union and sister States; to transfer their allegiance to an illegal confederacy of rebels and submit to its edicts, and in conjunction with the execution, had instituted a reign of terror, suppressed the free expression of popular will, and made elections a mockery and a fraud.  It continues: "We, therefore, the delegates here assembled in convention to devise such measures and take such action as the safety and welfare of the loyal citizens of Virginia may demand, having maturely considered the premises, and viewing with great concern the deplorable condition to which this once happy commonwealth must be reduced unless some regular adequate remedy is speedily adopted, and appealing to the Supreme Ruler of the Universe for the rectitude of our intentions, do hereby, in the name and on behalf of the good people of Virginia, solemnly declare that the preservation of their dearest rights and liberties, and their security in person and property, imperatively demand the reorganization of the government of the commonwealth, and that all acts of said convention and executive, tending to separate this commonwealth from the United States, or to levy and carry on war against them, are without authority and void; and that the offices of all who adhere to the said convention and executive, whether legislative, executive or judicial, are vacated."

The convention then immediately proceeded, almost in the very language of the Grand Assembly of 1658, to "*vindicate*" and restore the constitutional and loyal government of the State, and thereupon appointed a governor, lieuten-

ant governor, attorney general, executive council and other officers, and provided for the assembling of the legislature, &c. The sovereign powers wielded by the *government thus "vindicated and restored,"* and its successors, have fully and finally triumphed, and the usurpations, as declared and denounced, under the names of the governments at Richmond, have disappeared *in fact,* and never had any existence *in law.*

It would be marvelous indeed for a court whose powers were derived from the same source and exercised under the same authority with the declaration in question, to be found, without the weightiest reasons, questioning the validity and competency of that sovereign power. In other words, to decide itself a court and no court in the same breath. If that ordinance could not vacate the offices in question, then no law emanating from any human power on earth could; for the power that made the declaration was supreme in that particular. It had the highest motives and the most solemn duty to wield it to that end, and it has expressed it in the clearest and most positive terms, nor left the result contingent upon any event that might by chance fail. There cannot in the eye of the constitution and law, be two governments in a State, as supposed in the instruction, and both be lawful, though in conflict. If the one be lawful, the other must be unlawful; the one sustained by the patriotic allegiance of the people, the other, in war propped for a time by the treason of its adherents. Such was the case in Rhode Island, *Luther* vs. *Borden,* 7 How., 1. Such the case in Virginia, *Hood et al.* vs. *Maxwell,* 1 West Va. Rep., 219. Such the case in Kentucky, when the legislature passed an act establishing a new court of appeals, to be in lieu of the old court under the constitution. They elected the judges, amongst the ablest men in the State, who organized the court with its clerk and other officers, and took jurisdiction of appeals from the circuit courts and solemnly heard and determined the causes and certified its judgments and mandates to the courts below, which recognized the action and obeyed the order, by entering the same as the judgment in the

case on its records, and proceeded to carry it into execution. But the old superseded constitutional court of appeals, afterwards took the jurisdiction of the same case, reheard it, and declared the usurped action a nullity and the pretended court and judges to be neither court nor officers in the eye of the law, but simply individuals attempting what they had no lawful right or authority to do,—in other words, a usurpation. 1 J. J. Marshall, 206.

These pretended officers in Berkeley are alleged in the instruction to have acted in the premises as officers under the authority of the government of Virginia, and the Confederate States, so-called. By those terms the parties intend to refer, not to the true government of Virginia, but the usurped government at Richmond and its confederate, so-called.

Now, it will scarcely be pretended that that usurpation possessed, or could confer on its subaltern officers, powers more legitimate and effectual in the eye of the law administered by the courts of the established and lawful government, than the lawful legislature of Kentucky conferred on its new court of appeals, so-called. The same doctrine has been held in Arkansas where an execution issued since the war on a judgment rendered during the war, in a rebel State court, when there were no loyal courts or loyal State government existing in the State. The execution was quashed as issuing from a void authority. *Filkins* vs. *Hawkins.* Am. L. R. 1866.

From the foregoing I conclude that the declaration and ordinance *propio vigore* vacated the offices in question, and all other offices in Virginia whose incumbents adhered to the rebellion. A great mistake has been made in supposing that the parties embarked in the rebellion retained their offices till disfranchised by some judicial proceeding, or office found, executive proclamation or other like mode according to the course of the common law, and upon notice, to ascertain their criminality and eject the incumbents, as is ordinarily the case in times of peace.

But it has been wholly forgotten, though urged in the ar-

gument in defence of a rebel trespass, by the same learned counsel in another cause, how Lord Hale said there was a difference to be observed, in the view to be taken of things in time of war or public insurrection or rebellion, and in times of peace. What would be thought of the wisdom of a convention assembled under the circumstances and surrounded with the portents and perils of that of June, 1861, that should leave its offices in the hands of its foes to be lawfully wielded against it and its friends, till it should judicially investigate and determine, by its tribunals, in every particular case, on notice the thousands of officials who were guilty and were in fact *the rebellion par excellence?* In that case rebel officers would have to be tried and disfranchised by rebel officers, by virtue of an ordinance and authority which both repudiated and were warring to subvert, and that too, while two-thirds of them could not have been reached nor restrained by any judicial tribunal, on account of the rebellion which their course aided. Thus by increasing the necessity for their removal they would permanently secure the lawful exercise of their official powers, while they wielded them with effect against the government and courts charged with their removal, with the consoling assurance in the meanwhile that if they succeeded in their treasonable enterprise they were safe, and if they failed, their official acts would be upheld and sustained by the courts they failed to destroy. Such a construction reminds one of the language of the frogs to the boys in the fable:— "It may be sport to you, but it is death to us." But were it possible to entertain a serious doubt of the validity and effect of the ordinance aforesaid in vacating the offices in question, it is incontrovertible that the parties by embarking in the rebellion and adhering to the rebel government and holding their offices and wielding their powers under the authority and in the interest of the rebel government, thereby ceased to be officers of the loyal governments just as effectually as they ceased to acknowledge its authority and wield its powers; in other words they not only forfeited their offices but abdicated and abandoned them.

July Term,        Burkhart *et al. vs.* Jennings.        1867.

The question in another form has also been determined in another case at the present term, viz: *Hawver* vs. *Seldenridge, et. al.*

In any and every view of the case, therefore, in which it has been presented, it is clear that the pretended officers were, in point of law, not officers either *de jure* or *de facto*, nor can they be known or recognized as such by the courts, until the political departments of the government shall acknowledge the validity of the so-called government of which they profess to be and were a component part.

Nor is the result at all changed by the averment that the rebel government under which the defendants assumed to act, held forcible possession at the time of the county of Berkeley when the occurrence happened. For unlawful offices and unlawful officers, doing unlawful acts under an unlawful government in an unlawful insurrection and civil war could not be legitimate by such unlawful force. *Hood et al.* vs. *Maxwell*, 1 W. Va., 219; *Hedges* vs. *Michael ; Williams* vs. *Freeland ; Nadenboush* vs. *Sharer ;* and *Hawver* vs. *Seldenridge,* (decided at this term).

I think, therefore, the judgment of the court below should be reversed with costs, the verdict set aside and the cause remanded to the circuit court, to be there proceeded with in conformity to the principles above indicated. And that the defendant in error have leave, if he desire it, to amend his declaration in the court below upon payment of the costs thereof, and the plaintiffs in error like leave, to plead *de novo.*

Judge MAXWELL concurred.

JUDGMENT REVERSED.